**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF MONTANA**

**MISSOULA DIVISION**

_____

WILLIAM LARRY WEAVER,                    Cause No. CV-06-94-DWM-JCL

            Petitioner,

                                         ORDER DENYING PENDING MOTIONS AND
    vs.                                  FINDINGS AND RECOMMENDATION OF
                                         UNITED STATES MAGISTRATE JUDGE TO
ATTORNEY GENERAL OF THE                  DISMISS PETITION AND PARTIALLY GRANT
STATE OF MONTANA AND                     CERTIFICATE OF APPEALABILITY
WARDEN DAVID FRAZIER,

            Respondents.

_____

Currently pending before the Court is Petitioner William Larry Weaver's Petition for Writ

of Habeas Corpus filed under 28 U.S.C. § 2254 (Document 1), Motion for Discovery and to have

the Court serve Respondents (Document 11) and Motion for Default Judgment. (Document 18).

By prior Order, Weaver's second, third and fourth grounds for relief were denied with prejudice.

(Document 10).  Respondents, however, were required to file a responsive pleading to Weaver's

ineffective assistance of counsel claim.  An Answer was filed on April 11, 2007.  (Document 16).

The Court agrees with Respondent that Weaver's petition is barred by the applicable

statute of limitations set forth in 28 U.S.C. § 2244(d) and therefore recommends that the petition

be dismissed.

**I.  FACTUAL AND PROCEDURAL BACKGROUND**

On November 7, 1993, James Fremou's naked body was found by a hunter in the woods

near Crystal Creek, outside of Missoula.  During the next few years, the Missoula County

ORDER AND FINDINGS AND RECOMMENDATION OF U.S. MAGISTRATE JUDGE  / PAGE 1

Sheriff's Department interviewed numerous people about Fremou's death including Weaver. Weaver had been living with his wife and children in the Missoula area in 1993. In 1994, his fingerprints were taken during an arson investigation and he was identified as an escapee from a Georgia prison, where he had been serving a life sentence for child molestation. Weaver fled Montana but was arrested in Oregon and reincarcerated in Georgia.

In October 1995, Curtis "Shorty" Dye, an inmate in Georgia, wrote a letter to Missoula authorities stating that Weaver had told him that he had killed a man named Jim in Montana. Dye's letter led to the State of Montana charging Weaver with deliberate homicide on December 17, 1996 in the Fourth Judicial District Court in Missoula County for the death of James Fremou. The State alleged that Weaver shot and killed Fremou on or about October 9, 1993.

The District Court appointed Margaret Borg of the Public Defender's office to represent Weaver. Borg received police reports and taped interviews which included information suggesting the existence of potential alibi witnesses and other suspects as well as the identities of persons who allegedly heard people other than Weaver confess to killing Fremou. Neither Borg nor her investigator contacted or interviewed any of those potential witnesses before trial.

Trial began February 2, 1998. The only witnesses called by the defense were two inmates from the Georgia prison where Dye had been incarcerated to impeach Dye's credibility. Weaver was convicted February 9, 1998. On April 1, 1998, the trial court sentenced Weaver to life in prison without the possibility of parole with an additional ten years for the use of a firearm.

Weaver appealed to the Montana Supreme Court which affirmed his conviction on July 1, 2001. Thereafter, Weaver, through counsel, filed a petition for post-conviction relief on July 2, 2002. The trial court heard testimony on the petition on September 29, 2003. On January 12,

ORDER AND FINDINGS AND RECOMMENDATION OF U.S. MAGISTRATE JUDGE  / PAGE 2

2004, the trial court denied Weaver's petition.  Weaver appealed that denial to the Montana

Supreme Court which, on June 21, 2005, affirmed the denial.

Weaver's federal petition for writ of habeas corpus was filed on June 5, 2006 (it was

signed and deposited in the prison system for legal mail on May 21, 2006).  On January 24, 2007,

this Court issued a Findings and Recommendation to deny Weaver's second, third and fourth

grounds for relief.  (Document 8).  That recommendation was adopted in full on February 2,

2007. (Document 9).  The Court served Weaver's first claim regarding ineffective assistance of

counsel on Respondents and an Answer and Response was filed by the Montana Attorney

General on April 11, 2007. (Document 16).  Weaver has filed several responses to Respondent's

Answer.  (Documents 17, 19, 21 and 22).

## II.  GROUNDS FOR RELIEF

The only remaining claim in this action is Petitioner's assertion that he received

ineffective assistance of trial counsel. (Document 1-1, p. 4, ¶ 15(A)(1)).  Petitioner alleges that

his trial counsel was ineffective because she (1) failed to interview or subpoena certain witnesses

to appear and testify at trial; (2) failed to submit an entomologist's "bug" report which would

have indicated that on the date of the homicide, the gun which was the purported murder weapon,

was in a pawn shop; and (3) trial counsel only visited with Petitioner three times for 20 minutes

prior to the trial.  The Court previously found that Petitioner exhausted these claims in his appeal

of the denial of his petition for post-conviction relief.  See Weaver v. State, 327 Mont. 441, 114

P.3d 1039, 2005 MT 158 (Mont. 2005).[1]

---

[1]Respondent argues that Petitioner's claim regarding the limited number of visits with his

ORDER AND FINDINGS AND RECOMMENDATION OF U.S. MAGISTRATE JUDGE  / PAGE 3

## III.  ANALYSIS

This action is subject to the provisions of the Antiterrorism and Effective Death Penalty

Act of 1996 (AEDPA), which became effective on April 24, 1996.  Lindh v. Murphy, 521 U.S.

320, 326 (1997); Weaver v. Thompson, 197 F.3d 359, 362 (9th Cir. 1999).  Under AEDPA a

one-year statute of limitations applies to petitions filed under 28 U.S.C. § 2254.  28 U.S.C. §

2244(d) provides as follows:

> (1) A 1 year period of limitation shall apply to an application for writ of habeas
> corpus by a person in custody pursuant to the judgment of a State court.  The
> limitation period shall run from the latest of –
>> (A)     the date on which the judgment became final by the
>>         conclusion of direct review or the expiration of the time for
>>         seeking such review;
>> (B)     the date on which the impediment to filing an application
>>         created by State action in violation of the Constitution or
>>         laws of the United States is removed, if the applicant was
>>         prevented from filing by such State action;
>> (C)     the date on which the constitutional right asserted was
>>         initially recognized by the Supreme Court, if the right has
>>         been newly recognized by the Supreme Court and made
>>         retroactively applicable to cases on collateral review; or
>> (D)     the date on which the factual predicate of the claim or
>>         claims presented could have been discovered through the
>>         exercise of due diligence.
>
> (2) The time during which a properly filed application for State post-conviction or other
> collateral review with respect to the pertinent judgment or claim is pending shall not be
> counted toward any period of limitation under this subsection.

The judgment against Petitioner was entered on April 1, 1998 and his conviction and

---

trial counsel claim was not exhausted.  At the hearing on his petition for post-conviction relief,
Weaver testified that Ms. Borg visited him "maybe three (3) times" before his trial. (Document
16–Exhibit 10: PPCR Hearing Tr. at 127, Line 22-25).  Those visits primarily consisted of
discussions concerning the writ of habeas corpus Mr. Weaver wanted filed, and little about his
upcoming trial. (Document 16–Exhibit 10: PPCR Hearing Tr. at 126, Line: 16-18).  Given the
Court's recommendation to dismiss for failure to file within the applicable statute of limitations,
the Court will presume this claim was exhausted for purposes of this Order.

ORDER AND FINDINGS AND RECOMMENDATION OF U.S. MAGISTRATE JUDGE  / PAGE 4

sentence was affirmed by the Montana Supreme Court on July 2, 2001.  Consequently, Weaver's

judgment of conviction became final on October 1, 2001, the last day on which he could have

filed a petition of certiorari to the United States Supreme Court.[2]  Weaver filed a petition for

post-conviction relief on July 2, 2002.  The trial court denied the petition on January 12, 2004

and that denial was affirmed by the Montana Supreme Court on June 21, 2005.  Weaver did not

file his federal habeas petition until May 21, 2006 (in accordance with the prison mailbox rule).[3]

Pursuant to § 2244(d)(2), the time during which a properly filed application for state

post-conviction review is pending does not count toward the one-year period of limitations

prescribed by the AEDPA.  The period of limitations on Weaver's federal habeas petition began

to run on October 1, 2001, the date his conviction became final.  However, Weaver's counsel did

not file the petition for post-conviction relief until July 2, 2002, using up 275 days of the 365-day

period of limitations.  The statute of limitations was then tolled from July 2, 2002 until June 21,

2005 when the Montana Supreme Court affirmed the denial of Weaver's petition for post-

conviction relief.  At that juncture, Weaver had only ninety days in which to file his federal

habeas.  Weaver, however, did not file the petition for almost a year, well outside the one-year

period of limitations prescribed by the AEDPA.

In an effort to avoid dismissal of his petition as untimely, Weaver presents the following

---

[2]The one-year statute of limitations in § 2244(d)(1)(A) begins to run on the expiration of
the 90-day period "within which [a petitioner] could have filed a petition for a writ of certiorari
from the United States Supreme Court" following direct appeal.  Bowen v. Roe, 188 F.3d 1157,
1159 (9th Cir. 1999).  Ninety days from July 2, 2001 is September 30, 2001 which is a Sunday so
Petitioner's statute of limitations began to run on October 1, 2001.

[3]Under the prison mailbox rule, a habeas petition is considered filed on the date a pro se
petitioner delivers it to prison authorities for mailing.  Huizar v. Carey, 273 F.3d 1220, 1222 (9th
Cir. 2001).

ORDER AND FINDINGS AND RECOMMENDATION OF U.S. MAGISTRATE JUDGE  / PAGE 5

three arguments: (1) that the AEDPA does not apply, (2) that the statute of limitations was tolled

by his filing an application for sentence review, and (3) that the "actual innocence" exception

operates to equitably toll the statute of limitations.  The Court addresses each of these arguments

in turn.

      A.  <u>AEDPA is Applicable</u>

Weaver argues that the one-year statute of limitations does not apply to a 1993 homicide

case.  (Document 17, p. 1).  However, because Weaver <u>filed</u> his federal habeas petition after

April 24, 1996 (the effective date of the Antiterrorism and Effective Death Penalty Act of 1996),

AEDPA applies. <u>Stevenson v. Lewis</u>, 384 F.3d 1069, 1071 (9th Cir. 2004);  <u>Furman v. Wood</u>,

190 F.3d 1002, 1004 (9th Cir. 1999).

      B.  <u>Tolling by filing an Application with the Montana Sentence Review Division</u>

Weaver next points out that the Montana Sentence Review division of the Montana

Supreme Court reviewed his sentence and did not issue a decision until March 17, 2006.

Accordingly, he argues that he had one year from that date to file a federal habeas petition.

(Document 21).  He contends the Sentence Review Division must be considered part of

exhausting his state remedies and therefore the time to file his federal habeas petition did not

begin to run until March 17, 2006.

Weaver's application for sentence review would only toll the statute of limitations if it

were a "properly filed application for State post-conviction or other collateral review with respect

to the pertinent judgment or claim." § 2244(d)(2).  The United States Supreme Court in <u>Duncan</u>

<u>v. Walker</u>, 533 U.S. 167, 121 S.Ct. 2120, 2127-28, 150 L.Ed.2d 251 (2001) stated that the goals

of this AEDPA tolling provision are: (1) ensuring "that the state courts have the opportunity fully

ORDER AND FINDINGS AND RECOMMENDATION OF U.S. MAGISTRATE JUDGE  / PAGE 6

to consider federal-law challenges to a state custodial judgment before the lower federal courts may entertain a collateral attack upon the judgment," and (2) serving "the well-recognized interest in the finality of state court judgments." Id. at 2128.  Section 2244(d)(1) "reduces the potential for delay on the road to finality by restricting the time that a prospective federal habeas petitioner has in which to seek federal habeas review." Id.

Mont. Code Ann. § 46-18-903 allows a defendant to apply to the Sentence Review Division to challenge the inequity or disparity of his sentence. State v. Evans, 247 Mont. 218, 231, 806 P.2d 512, 520 (1991).  The Sentence Review Division may increase or decrease the original sentence. Mont. Code Ann. § 46-18-904.  However, the Sentence Review Division does not review errors of law resulting in an illegal sentence. State v. Simtob, 154 Mont. 286, 288, 462 P.2d 873, 874 (1969).  Sentence reviews are final and non-appealable. Mont. Code Ann. § 46-18-905.

The Montana Supreme Court (as opposed to the Sentence Review Division) reviews the legality of criminal sentences and thus is the proper arena to bring federal constitutional challenges to criminal sentences.  Since sentence review does not review errors of law it does not serve as the substitute for an appeal, habeas proceeding or petition for post-conviction relief and it cannot serve as the forum to exhaust state court remedies for purposes of federal habeas corpus review.

In that respect, Weaver's application for sentence review differs from the "motion to vacate illegal sentence" at issue in Tillema v. Long, 253 F.3d 494 (9th Cir. 2001).  In Tillema, the Ninth Circuit found that the petitioner's state court motion to vacate illegal sentence was a "properly filed application for State post-conviction or other collateral review" within the

ORDER AND FINDINGS AND RECOMMENDATION OF U.S. MAGISTRATE JUDGE  / PAGE 7

meaning of 28 U.S.C. § 2244(d)(2).  The issue in <u>Tillema</u>, however, was whether petitioner's

motion raising a claim not raised in federal court could toll the statute of limitations.  There was

no detailed examination of the nature of petitioner's motion.    Nonetheless, it is clear from the

opinion that the motion was filed in the trial court and its denial was appealed directly to the

Nevada Supreme Court.  The issue raised in the motion was a legal question regarding whether

the pre-sentence investigation report erroneously represented that Tillema had violated his parole

in a prior case.  There is no discussion in <u>Tillema</u> as to the authority upon which the motion was

filed.

In contrast, Weaver's application for sentence review was filed directly with the Sentence

Review Division.  By definition, the application could only raise issues pertaining to the equity

of the sentence not its legality under either state or federal law and it was not appealable.  Thus,

the Court is of the opinion that the pendency of Weaver's application for sentence review did not

toll the one-year period of limitations under § 2244(d)(2).[4]

---

[4]<u>See also</u> <u>Bridges v. Johnson</u>, 284 F.3d 1201, 1203 (11th Cir.2002) (finding that a state
sentence review process does not qualify as post-conviction relief under Section 2244(d)(2)
"because it does not promote exhaustion by giving state courts the opportunity to consider
federal-law challenges to state court judgments, and it does not promote finality of state court
judgments by reducing the time in which federal review is sought."); <u>Young v. Head</u>, 89
F.Supp.2d 1370, 1370 (N.D.Ga.2000) (application for sentence review made pursuant to Georgia
statute did not toll the § 2244(d) statute of limitations since an application for sentence review "is
not a mechanism for 'collateral review with respect to the pertinent judgment.' "), <u>aff'd</u>, 247 F.3d
247 (11th Cir.2001) (Table); <u>Nicholson v. Higgins</u>, No. 05-7032, 2005 WL 1806446 (10th Cir.
Aug. 2, 2005) (unpublished) (acknowledging in a footnote that the petitioner had sought judicial
review under Okla. Stat. tit. 22, § 982a, and reasoning that because "such motions seek
discretionary review [and] their denial is not appealable" they "therefore do not constitute post-
conviction proceedings for purposes of tolling the AEDPA limitations period"); <u>Elliott v. Jones</u>,
2006 SL 2711670 (N.D.Okla September 21, 2006)(unpublished)(following <u>Nicholson</u> in finding
that a motion seeking judicial review and modification of a sentence did not toll the § 2244(d)(1)
statute of limitations). <u>But</u> <u>see</u> <u>Foster v. Maloney</u>, 2003 WL 345351 (D.Mass February 14, 2003)
(motion for review of sentence by sentence review appellate division of superior court tolled the

C. <u>Actual Innocence</u>

Finally, Weaver claims he is actually innocent of the crime for which he was convicted and that actual innocence is an exception to the statute of limitations. (Document 22).

The issue of whether actual innocence will equitably toll the AEDPA statute of limitations has not yet been decided by the United States Supreme Court or the Ninth Circuit Court of Appeals.  While a divergence of opinion exists among the courts of appeals that have considered the issue, the majority have held that the statute of limitations is subject to equitable tolling. <u>See</u>, <u>e.g.</u>, <u>Souter v. Jones</u>, 395 F.3d 577, 602 (6th Cir. 2005) (holding that "where an otherwise time-barred habeas petitioner can demonstrate that it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt, the petitioner should be allowed to pass through the gateway and argue the merits of his underlying constitutional claims"); <u>Flanders v. Graves</u>, 299 F.3d 974, 978 (8th Cir. 2002) (requiring that equitable tolling based on actual innocence be accompanied by "some action or inaction on the part of the respondent that prevented [the petitioner] from discovering the relevant facts in a timely fashion, or, at the very least, that a reasonably diligent petitioner could not have discovered these facts in time to file a petition within the period of limitations"); <u>Gildon v. Bowen</u>, 384 F.3d 883, 887 (7th Cir. 2004), <u>cert. denied</u>, 543 U.S. 1168, 125 S.Ct. 1348, 161 L.Ed.2d 144 (2005) (adopting the Eighth Circuit's approach in <u>Flanders</u>); <u>Gibson v. Klinger</u>, 232 F.3d 799, 808 (10th Cir. 2000) (holding that equitable tolling is appropriate "when a prisoner is actually innocent" and "diligently pursue[s] his federal habeas claims"); <u>Felder v. Johnson</u>, 204 F.3d 168, 171 & n. 8 (5th Cir. 2000) (observing that a claim of actual innocence "does not constitute a 'rare and

AEDPA statute of limitations).

ORDER AND FINDINGS AND RECOMMENDATION OF U.S. MAGISTRATE JUDGE  / PAGE 9

exceptional circumstance,'" but suggesting that a "showing of actual innocence" might). But see David v. Hall, 318 F.3d 343, 347 (1st Cir.2003) (holding that petitioners "who may be innocent are constrained by the same explicit statutory or rule-based deadlines as those against whom the evidence is overwhelming"); Araujo v. Chandler, 435 F.3d 678 (7th Cir. 2005)(actual innocence is not a freestanding exception to the statute).

The Ninth Circuit has referred to the potential constitutional issues which might arise if one who is actually innocent could not file a habeas petition.  See Majoy v. Roe, 296 F.3d 770 (9th Cir. 2002).[5]  Majoy indicates that should such an exception to the statute of limitations exist, the standard for determining its application is that set forth in Schlup v. Delo, 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995).

Schlup was an inmate sentenced to death for participating with two others in the murder of a fourth inmate. Schlup, at 301-306, 115 S.Ct. 851.  At his trial, the State's evidence consisted primarily of two corrections officers who witnessed the killing.  Schlup's defense was that the State had the wrong man.  He relied on a videotape from the prison dining room that showed he was the first inmate to walk into the dining room for the noon meal and it was not until 65

---

[5]Majoy cited to Triestman v. United States, 124 F.3d 361, 378-79 (2d Cir.1997) (observing in dicta that the procedural denial under AEDPA of collateral review to a party claiming actual innocence could raise serious constitutional problems); see also Miller v. Marr, 141 F.3d 976, 978 (10th Cir.1998) (noting that if AEDPA's statute of limitation prevented a petitioner who is actually innocent from filing a first federal habeas petition, AEDPA's limitation period would "raise [ ] serious constitutional questions and possibly render[ ] the habeas remedy inadequate and ineffective"); In re Dorsainvil, 119 F.3d 245, 248 (3d Cir.1997) (observing that "[w]ere no other avenue of judicial review available for a party who claims that s/he is factually or legally innocent ... we would be faced with a thorny constitutional issue"); United States v. Zuno-Arce, 25 F.Supp.2d 1087, 1102 (C.D. Cal. 1998) ("[T]o foreclose a claim of constitutional violation where there has been a colorable showing of factual innocence would likely constitute a due process violation or an improper suspension of habeas corpus relief"); Alexander v. Keane, 991 F.Supp. 329, 334-39 (S.D.N.Y.1998).

seconds after his entrance that several guards ran out of the dining room in apparent response to the distress call regarding the assault.  The jury found Schlup guilty and he was sentenced to death.

In his first petition for habeas relief, Schlup claimed that his counsel was ineffective for failing to interview and call witnesses who could establish his innocence.  The District Court denied his petition finding it to be procedurally barred and that decision was upheld by the Eighth Circuit in 1991. Id. at 306, 115 S.Ct. 851.  His second petition for habeas relief in federal district court was also denied and again, the Eighth Circuit affirmed. Id. at 309, 311, 115 S.Ct. 851.  He then appealed to the United States Supreme Court and based his claim on actual innocence. Id. at 313, 115 S.Ct. 851.

The Supreme Court found that, "Schlup may obtain review of his constitutional claims only if he falls within the narrow class of cases . . . implicating a fundamental miscarriage of justice." Schlup, 513 U.S. at 314-15, 115 S.Ct. 851 (internal quotation marks and citations omitted).  A fundamental miscarriage of justice or actual innocence claim is "'not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits.'" Id. at 315, 115 S.Ct. 851 (quoting Herrera v. Collins, 506 U.S. 390, 404, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993)).[6]

In order to make such a showing, Schlup was required to present "evidence of innocence

_____

[6]By comparison, the United States Supreme Court in Herrera v. Collins, 506 U.S. 390, 113 S.Ct. 853 (1993), explained that the standard for making a freestanding claim of actual innocence (as opposed to attempting to overcome a procedural bar) would require a showing that would have to be "truly persuasive" and the threshold would be "extraordinarily high." Herrera, 506 U.S. at 417.  "A petitioner asserting both innocence and constitutional error "need carry less of a burden" with respect to innocence than a petitioner like Herrera who claimed only innocence." Carriger v. Stewart, 132 F.3d 463, 477-478 (9th Cir. 1997).

so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error." Id. at 316, 115 S.Ct. at 861. That is, a petitioner must show that in light of all the evidence, including new evidence, "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." Schlup, 513 U.S. at 327, 115 S.Ct. at 867.  The Schlup Court emphasized that in considering all the available evidence, the court is not bound by the rules of admissibility, but must consider "all the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial." Id. (quoting Friendly, Is Innocence Irrelevant? Collateral Attack on Criminal Judgments, 38 U. Chi. L.Rev. 142, 160 (1970)).

Schlup's trial counsel was provided with and apparently reviewed 100 interviews conducted by prison investigators and yet (like Weaver's trial counsel) he failed to conduct individual interviews with the potential witnesses to the crime. Schlup, 513 U.S. at 313.[7]  By failing to conduct his own interviews, counsel apparently missed three pieces of evidence which the United States Supreme Court found sufficient to raise enough doubt about Schlup's guilt to undermine confidence in the result of the trial.  That evidence included the affidavits of three black inmates attesting to Schlup's (who was white) innocence in a racially motivated killing; the affidavit of another inmate describing his prompt radio call for assistance immediately following

---

[7]The Schlup Court specifically mentioned Judge Heaney's dissent in the Eighth Circuit's denial of Schlup's habeas petition wherein Judge Heaney emphasized that, "at no point before, during, or after trial did Schlup's counsel interview any of the one hundred potential eyewitnesses made known to him by the state.  In this his representation fell below the level required by the Sixth Amendment." Schlup v. Delo, 11 F.3d 738, 747 n. 5 (8th Cir. 1993) vacated by 513 U.S. 298 (1995).

the stabbing; and the affidavit of another correctional officer describing Schlup's unhurried walk to the dining room.  Based on this evidence and the videotape, Schlup argued that he could not have been involved in the murder.  While the Supreme Court found this evidence was not sufficient to meet the <u>Herrera</u> standard for a freestanding claim of actual innocence, it was sufficient to meet the threshold showing of innocence necessary to justify a review of the merits of his constitutional claims.

Utilizing the <u>Schlup</u> standard, the Court will look to Petitioner's state court petition for post-conviction relief to determine whether there was any evidence that the jury did not know about which is sufficient to show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.  That is, is there evidence of innocence so strong that this Court cannot have confidence in the outcome of the trial?

1. <u>Questions regarding the Murder Weapon and the Date of the Murder</u>

a. <u>Dr. Catts' Bug Report</u>

The State sent maggots discovered during the autopsy on Fremou's body to the Washington State University Forensic Entomology Laboratory in Pullman, Washington, to confirm the date of Fremou's death.   E.P. Catts, Ph.D. (Catts), produced an entomological report (the Catts report) that concluded that Fremou died sometime after October 13, 1993.  This date conflicted with the State's theory that Fremou had been killed on October 9, 1993.  Importantly, the State's theory was based on Dye's testimony that Weaver used a rifle owned by John McKean to shoot Fremou--a rifle that McKean pawned on October 11, 2003.

Weaver's trial counsel discovered the day before trial that entomologist Catts had died April 5, 1996, approximately eight months before the State had identified him as a witness and

nearly two years before the trial.  On the first day of trial, the State sought to use a new expert witness, Dr. Neal Haskell (Haskell), (who had not been identified to the defense prior to trial), to support its theory regarding the date of Fremou's death.  Defense counsel Borg met with Haskell immediately before trial and discovered that he had actually reached a different conclusion from Catts regarding the age of the maggots and the corresponding time of Fremou's death.  Haskell's conclusion was consistent with the State's theory.  Accordingly, the State requested a continuance so it could have Haskell prepare a new report for use at trial.

Borg, in consultation with Weaver, argued against the State's request for a continuance.[8] The District Court denied the State's request for a continuance ruling that Haskell could supply a foundation for the Catts report but he would not be allowed to offer any differing conclusions. (Document 16–Exhibit 3: Trial Tr. at 11).  When the State suggested that it might call Haskell in rebuttal, the trial court indicated that it would not make a pretrial ruling but would take up and allow briefing on the rebuttal issue if necessary.  The trial court never made a ruling whether Haskell could be called in rebuttal. (Document 16–Exhibit 3: Trial Tr. at 153).  Uncertain as to what the trial court might rule, Borg feared that if she had called Haskell as a foundation witness for the Catts report, the State would have used Haskell as a rebuttal witness to contradict the Catts report regarding Fremou's time of death.  Ultimately, the Catts report was not offered into evidence and Haskell did not testify.

Despite there being two expert opinions regarding the date of Fremou's death, Detective Crego testified that, "Actually there's no way to determine exactly when someone dies, unless

_____

[8]However, in his meeting with Borg on this issue, Weaver stated that he wanted the jury to see the bug reports.

it's witnessed." (Document 16–Exhibit 3: Trial Tr. at 568-69).  Similarly, the coroner was asked

by the prosecution if there was a way to determine an exact date or time of death.  The coroner

testified that, "[t]he only way to determine exact time would have to have been there."

(Document 16–Exhibit 3: Trial Tr. at 258-59).

### b.  John McKean's Affidavit

Weaver sought to introduce at the hearing on his petition for post-conviction relief an

affidavit signed and notarized by John McKean.  John McKean's army rifle was the alleged

murder weapon.  McKean's affidavit apparently stated that McKean never relinquished

possession, custody, or control of his rifle to Weaver. (Document 16–Exhibit 10: PPCR Hearing

Tr. at 38).  The affidavit was rejected as an exhibit at the hearing for its content, but Ms. Borg

agreed that Mr. McKean's testimony would have been crucial to the defense if consistent with the

affidavit. (Document 16–Exhibit 10: PPCR Hearing Tr. at 40, Line 17-23).

Ms. Borg, however, had failed to contact or interview Mr. McKean and did not call him

to testify at the time of trial. (Document 16–Exhibit 10: PPCR Hearing Tr. at 40, Line 11-16).

Consequently, the testimony that Mr. McKean's rifle was the murder weapon used by Mr.

Weaver went unchallenged by the defense.  Mr. McKean was never asked by anyone prior to trial

including Captain Crego, the State's chief witness and investigator whether he allowed Mr.

Weaver to use his rifle.

### c.  Shotgun or Rifle

In his response to the Respondent's Answer, Weaver raises an argument pertaining to

whether the murder weapon was a rifle or a shotgun. Weaver appears to argue that since the

coroner testified about a shotgun being used to kill Fremou and McKean's gun was a rifle, that

ORDER AND FINDINGS AND RECOMMENDATION OF U.S. MAGISTRATE JUDGE  / PAGE 15

his counsel was ineffective for failing to point out the distinction.  The Court finds this to be an interesting discrepancy.  Except for one reference to a hunting rifle, the coroner in his testimony only discussed the murder weapon as a shotgun.  The one reference to a rifle was used in conjunction with the coroner's description of "shotgun wound."  He testified, "the nature of the appearance on the radio-photographs strongly indicated this was what we call a high velocity shotgun wound meaning bullet velocities generally exceeding 2,000 feet per second, such as a hunting rifle would be the most common firearm in use fitting this type of velocity, and the reasons is that the–there are so many of these small core fragments on the x-ray, it gives a unique appearance which we call a snowstorm."  (Document 16–Exhibit 3: Trial Tr. at 254).  However, John McKean's gun was apparently a rifle and the parties only described the murder weapon as a rifle.  Whether this distinction is important, incidental, intentional or an oversight on the part of the parties is not known.  However, whether it was pointed out by his attorney or not, the jury heard the coroner's testimony regarding a shotgun and could weigh that testimony with regard to the prosecution's argument that Weaver used McKean's rifle to kill Fremou.  This is insufficient to demonstrate actual innocence.

2.  <u>Witnesses who heard Other Suspects Confess to Fremou's Murder</u>

Weaver contends that his counsel failed to interview and call to testify a number of potential witnesses who could have provided testimony regarding the alleged confessions of two other suspects.  At the hearing on the petition for post-conviction relief, defense counsel Borg admitted that she neither interviewed nor subpoenaed to testify at trial the following witnesses: Reginald Colby, Shane Colby, Dan Lery Martin, Dale Wallace, Gloria Clark, Michelle Richards, Mervin "Spike" Jones, Sam Brandvold, Russell "Rusty" Beier, Theresa Richel Hollingworth, Jim

Wallace, Tanya Rischel, Gene Barnes, Eugene "Geno" Rishel, Christy Shipley, E.P. Catts, PH.D., Steve Hollingsworth, Ann Fremou aka Ostlie, Tracy Reinke, Heather Bell, Vanda Harrison, Felipa "Fifi" Kingsberry, Mike Miller.  However, trial counsel defended her actions by stating that she made the decision to introduce these individuals' statements through Captain Crego, the state's lead witness.

The mere lack of live witness testimony (as opposed to their statements being recited by Detective Crego) is insufficient to demonstrate that no reasonable juror would have found Weaver guilty beyond a reasonable doubt.  While the Court does not have in its record the complete statements (taken by law enforcement agents) regarding what these individuals might have testified, Weaver argued at the hearing on the petition for post-conviction relief about several pieces of information which were not brought out at trial.

          a.  <u>Shane Colby</u>

First, Shane Colby gave a statement to law enforcement officers regarding a confession to the Fremou murder by Dale Wallace.[9]  Although Detective Crego testified about Shane Colby's statement, there was some information which was not brought out at trial.  For example, at trial Detective Crego testified that Shane Colby had said that Dale Wallace stated that "they" took Mr. Fremou to Rock Creek.  However, in his taped statement Mr. Colby had actually stated "Rock Creek <u>or something like that.  Rock Creek or some other creek</u>." (Document 16–Exhibit 10: PPCR Hearing Tr. at 86, Line 1-21.).  The prosecutor then asked Captain Crego (referring to Rock Creek), "That's no where near where the body was found," to which Captain Crego replied,

_____

[9]Dale Wallace was dating a woman who's children Fremou was alleged to have molested several years prior to the murder.

ORDER AND FINDINGS AND RECOMMENDATION OF U.S. MAGISTRATE JUDGE  / PAGE 17

"That's correct." (Document 16–Exhibit 3:  Trial Tr. at 558; Exhibit 10: PPCR Hearing Tr. at 88, Line 19-23).  Ms. Borg did not object or seek to clarify this statement.  Weaver argued that the jury was necessarily left with the misconception that Mr. Wallace's confession was not credible.

Secondly, Mr. Colby indicated that Wallace explained that he helped drag Fremou's body down the hill and threw a bit of dirt over it.  Crego agreed that information was consistent with the murder scene, but it was not brought out at trial. (Document 16–Exhibit 10: PPCR Hearing Tr. at 88-89).

Third, Captain Crego never told the jury that after Mr. Colby heard Mr. Wallace's confession, Mr. Colby talked to Mr. Wallace about going to the police or a lawyer.  Nor did Captain Crego point out that Mr. Wallace said he was going to talk to the other guy "meaning the other guy involved in the killing" to see what he could do. (Document 16–Exhibit 10: PPCR Hearing Tr. at 90, Line 2-21).

Finally, Captain Crego never told the jury about Mr. Colby's statement regarding Dale Wallace's description of Fremou "begging and crying and saying no, I didn't mean to do this. I'm sorry, please forgive me. Just begging for his life" (Document 16–Exhibit 10: PPCR Hearing Tr. at 90, Line 22-25 and 91, Line 1-8).

### b.  Beir and Jones

Russell "Rusty" Beir and Mervin "Spike" Jones were two other potential witnesses who both gave statements to law enforcement indicating that they had heard about Dale Wallace and his involvement with the murder of Fremou.  Both men stated that Wallace was acting unusual around the time of Fremou's death and both indicated they felt he was involved. The jury did not hear this evidence.

ORDER AND FINDINGS AND RECOMMENDATION OF U.S. MAGISTRATE JUDGE  / PAGE 18

c  Doug Schmidt

On direct examination at trial, witness Doug Schmidt testified that one time when Weaver was very drunk he told Schmidt that the last time he saw Jim Fremou was a night when he dropped him off at the T&C bar and then he and another guy killed some other guy and did not get home until 5:00 in the morning. (Document 16–Exhibit 3: Trial Tr. at 377).

However, on cross examination Petitioner's trial counsel asked Mr. Schmidt for the date of the conversation when Weaver told him about, "shooting someone, taking his clothes off, and burying him in a brush pile."  (Document 16–Exhibit 3: Trial Tr. at 382).[10]  Captain Crego admitted at the hearing on the petition for post-conviction relief that Doug Schmidt never testified to nor told investigators that Mr. Weaver said he had shot someone, "Taking his clothes off and burying him in a brush pile."  Thus, it appears that defense counsel may have confused the two witnesses and presented untrue information in a leading question to Schmidt. (Document 16–Exhibit 10: PPCR Hearing Tr. at 96.)

d.  Jim Wallace

Jim Wallace had told investigators that his brother Dale Wallace had nightmares about Fremou's face just before he was shot.  This information was not disclosed at the trial.

e.  Gloria Clark

Although some information regarding Dale Wallace's confession to Gloria Clark was elicited from Captain Crego, she testified at the hearing on the petition for post-conviction relief

---

[10]The witness immediately preceding Mr. Schmidt, Donald Watts, Jr., testified that Weaver came over to his house one night and that while they were drinking, Weaver pulled a gun out from underneath his coat and said that he killed a man, took his clothes and buried him with brush. (Document 16–Exhibit 3: Trial Tr. at 370).

ORDER AND FINDINGS AND RECOMMENDATION OF U.S. MAGISTRATE JUDGE  / PAGE 19

that Dale was acting scared and a little nervous at the time he told the story and at one point he

put his head in his hands and seemed to be quite upset.  This aspect of Ms. Clark's testimony was

not brought out at trial.

### 3.  Evidence Supporting the Jury's Guilty Verdict

The Court must then consider what evidence was presented at trial that supported

Weaver's conviction.  Weaver's conviction primarily hinged on the testimony of Curtis Dye.

What the State focused on at the trial (and perhaps the most compelling aspect of Dye's

testimony) was the accuracy of the details Dye knew about the murder and the area where

Fremou's body was found.  Although Dye had never been to Montana, he was able to give the

following details about Fremou's murder:  (1) the body was found in Pattee Canyon, (2)

Fremou's body was drug by the head, (3) the killer had removed his clothes, (4) there was an area

where people build fires near where the body was found, (5) there was a creek near where the

body was found, (6) Fremou liked to drink "animal beer," (7) death was not instantaneous, (8)

Fremou's foot was still moving after he was shot, and (9) the soil was hard to dig which is why

the body was covered with sticks and debris rather than just dirt.

In addition to Dye's testimony, three other witnesses gave testimony about what could be

considered to be confessions from Weaver.  As set forth above in footnote nine above, Donald

Watts testified that one night when Weaver was at his home, Weaver pulled a gun out from

underneath his coat and said that he shot and killed a man, took his clothes and buried him with

brush. (Document 16–Exhibit 3: Trial Tr. at 300, 370).

Similarly, Doug Schmidt testified that Weaver told him that the last time he had seen Jim

was when he dropped Jim off at the T&C and then picked up another guy at the bar and killed

some guy and did not get home until 5am.  Weaver also told Schmidt and Tammy Rishel while

he was swinging an ax that he had killed a guy and could hurt them also.  (Document 16–Exhibit

3: Trial Tr. at 378).

The Court cannot condone counsel in a murder case failing to interview so many potential

witnesses and failing to realize that the expert, who's opinion would apparently "sink[s] the

State's theory," had been dead for nearly two years prior to trial.  However, Petitioner himself

failed to timely file his federal habeas petition.  Although he has presented some evidence in an

attempt to establish "actual innocence" it is not sufficient to demonstrate that it is more likely

than not that no reasonable juror would have found him guilty.

Given the Catts report and McKean's affidavit, there is some evidence to bring into doubt

Dye's testimony that Weaver used John McKean's gun to kill Fremou.  In addition, the

prosecutor said in a pretrial hearing that the Catts report "sinks the State's theory."  However,

Weaver's "evidence of actual innocence" does not sufficiently undermine the evidence presented

at trial.  Even given the questions regarding the date of Fremou's death and whether or not Mr.

McKean's gun was used to kill Fremou, the testimony of Dye, Watts, Schmidt and Tammy

Rischel is compelling and contains sufficient details of the Fremou murder to convict Petitioner.

On this record, the Court cannot say that Petitioner has established that it is more likely than not

that no reasonable juror would have convicted him.

Therefore, Petitioner cannot overcome his failure to file within the applicable statute of

limitations and his habeas petition should be dismissed.

## IV. CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), as amended by the AEDPA, "[a] certificate of

appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." See Hohn v. United States, 524 U.S. 236, 240 (1998); Lambright v. Stewart, 220 F.3d 1022, 1024 (9th Cir. 2000). The "substantial showing" standard can be satisfied on an issue-by-issue basis. Lambright, 220 F.3d at 1024 (citing 28 U.S.C. § 2253(c)(3)).

The United States Supreme Court has defined the standard of issuance for a COA as follows:

> To obtain a COA under §§ 2253(c), a habeas prisoner must make a substantial showing of the denial of a constitutional right, a demonstration that, under Barefoot, includes showing that reasonable jurists could debate whether (or, for that matter agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'

Slack, 529 U.S. at 483-484 (citing Barefoot v. Estelle, 463 U.S. 880, 893 (1983)).

"The court must resolve doubts about the propriety of a COA in the petitioner's favor." Jennings v. Woodford, 290 F.3d 1006 (9th Cir. 2002) (citing Lambright, 220 F.3d at 1025). In addition, a petitioner is not required to establish that he will prevail on the merits. Lambright, 220 F.3d at 1025 (citing Barefoot, 463 U.S. at 893 n.4). Rather, the COA requirement seeks only to prevent frivolous appeals from wasting judicial resources, while still affording petitioners an opportunity to show potential for merit. Lambright, 220 F.3d at 1025.

The Ninth Circuit has described at least two examples of situations which may satisfy the Barefoot standard. First, the standard may be met where although there is a controlling rule in the particular circuit, another circuit has reached a conflicting view. Id. at 1025-26. Second, a petitioner may persuasively argue that circuit law which forecloses relief should be reconsidered. Id.

ORDER AND FINDINGS AND RECOMMENDATION OF U.S. MAGISTRATE JUDGE  / PAGE 22

The COA must indicate which issues satisfy the required showing.  28 U.S.C. § 2253(c)(3).  Additionally, the district judge must "state why a certificate should not issue."  Fed. R. App. P. 22(b)(1).

Petitioner has failed to make a substantial showing that he was deprived a federal constitutional right with regard to his second, third and fourth claims for relief.  Petitioner's second claim that he received ineffective assistance of counsel during his post-conviction proceedings fails to state a claim because there is no constitutional right to counsel in a state post-conviction proceedings.  Coleman v. Thompson, 501 U.S. 722, 752, 111 S.Ct. 2546 (1991).  Reasonable jurists would not differ on this issue.

Similarly, Petitioner's third claim that the State of Montana did not have jurisdiction to prosecute him for a murder which he alleges took place on federal land is frivolous.  Again, reasonable jurists would not differ on this issue.

Petitioner's claim regarding an improper extradition from Georgia is meritless in that the manner in which Weaver was brought to Montana does not invalidate his murder conviction.  Finally, there is no factual basis for Petitioner's allegation that the prosecution had Curtis Dye lie in his testimony.  Therefore, no certificate of appealability should be granted on this issue.

However, the Court does recommend that it would be appropriate to grant a certificate of appealability with regard to whether Petitioner's ineffective assistance of counsel claim is barred by the applicable statute of limitations.  Reasonable jurists could debate whether a state sentence review petition would toll the statute of limitations, whether there is an actual innocence exception to the federal habeas statute of limitations and if so whether the facts of this case would fall into such an exception.

ORDER AND FINDINGS AND RECOMMENDATION OF U.S. MAGISTRATE JUDGE  / PAGE 23

## V. PENDING MOTIONS

    A.  <u>Motion for Discovery and to have the Court serve Respondents (Document 11)</u>

Petitioner seeks an order from the Court asking the Public Defender's Officer to turn over their files of Weaver's case.  He also seeks the 2005 Montana Legislature's case file documents, hearing transcripts and complaint file on why the public defenders' office needed changing due to their ineffectiveness.  Rule 6 of the Rules Governing Section 2254 Cases provides that a judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Civil Procedure.  Given the Court's ruling regarding Petitioner's failure to file within the applicable statute of limitations, the Court finds that there is no need to conduct discovery in this case and Petitioner's motion will be denied.

Petitioner also asks that a copy of the post-conviction hearing transcript and appellant's brief to the Supreme Court of Montana in Docket No. 04-272, and the dissents in the Montana Supreme Court's decision on Petitioner's appeal be made part of the record.  As those documents were submitted by Respondent as part of the Answer, this portion of the motion is moot.

Finally, Petitioner asks that the Court serve copies of his documents on Respondents. While the Court's electronic filing system does provide an e-mail copy of Petitioner's documents to Respondents' counsel, that is only done after counsel enters an appearance in the case. Despite the Court's electronic filing system, it is still Petitioner's responsibility to serve all documents on Respondents' counsel.  Accordingly, this portion of Petitioner's motion will be denied.

    B.  <u>Motion for Default Judgment. (Document 18)</u>

Weaver filed a motion for default judgment on the grounds that Respondent failed to file

ORDER AND FINDINGS AND RECOMMENDATION OF U.S. MAGISTRATE JUDGE  / PAGE 24

an Answer on or before March 12, 2007 as required by the Court's January 24, 2007 Order.

However, on March 13, 2007, the Court granted Respondent's motion for extension of time to

file an answer making the answer due on April 11, 2007.  (Document 15).  As Respondent's

Answer was timely filed on April 11, 2007 (Document 16), Weaver's Motion for Default

Judgment will be denied.

Based on the foregoing, the Court enters the following:

## ORDER

1.  Petitioner's Motion for Discovery and to have the Court serve Respondents

(Document 11) is **DENIED.**

2.  Petitioner's Motion for Default Judgment. (Document 18) is **DENIED.**


Further, the Court enters the following:

## RECOMMENDATION

Weaver's first claim for relief and his petition for writ of habeas corpus should be

**DISMISSED** for failure to comply with the applicable statute of limitations and a Certificate of

Appealability should be **GRANTED** as to whether Petitioner's first claim for relief is barred by

the applicable statute of limitations but **DENIED** as to his remaining claims.


## NOTICE OF RIGHT TO OBJECT TO FINDINGS & RECOMMENDATION AND CONSEQUENCES OF FAILURE TO OBJECT

The Clerk of Court shall serve a copy of these Findings and Recommendation on the

parties.  The parties are advised that, pursuant to 28 U.S.C. § 636(b)(1), they have the right to file

ORDER AND FINDINGS AND RECOMMENDATION OF U.S. MAGISTRATE JUDGE  / PAGE 25

written objections to this Findings and Recommendation.  Any objections to the Findings and

Recommendation must be filed with the Clerk of Court within twenty (20) days after entry of this

recommendation as indicated on the Notice of Electronic Filing attached hereto, or objection is

waived.

**PETITIONER IS CAUTIONED THAT HE MUST KEEP THE COURT ADVISED**

**OF ANY CHANGE OF ADDRESS AND A FAILURE TO DO SO COULD RESULT IN A**

**DISMISSAL OF THIS CAUSE OF ACTION.**

DATED this 24th day of May, 2007.

/s/ Jeremiah C. Lynch
Jeremiah C. Lynch
United States Magistrate Judge

ORDER AND FINDINGS AND RECOMMENDATION OF U.S. MAGISTRATE JUDGE  / PAGE 26